**ORIGINAL**

EMMETT E. LEE LOY, #5689
758 Kapahulu Avenue, #429
Honolulu, Hawaii 96816
Tel. No. 922-0455
Fax. No. 922-0422

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 27 2006

at ___ o'clock and ___ min. ___ M
SUE BEITIA, CLERK

Attorney for REED K. AKEN, SR.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR. NO. 05-00300 JMS-07 |
| Plaintiff, ) | DEFENDANT REED K. AKEN SR.'S SENTENCING STATEMENT; CERTIFICATE OF SERVICE |
| vs. ) | |
| REED K. AKEN, SR., ) | Sentencing Hearing Date: |
| Defendant (07). ) | Date: April 3, 2006 |
| ) | Time: 2:15 p.m. |
| ) | Judge: Hon. J. Michael Seabright |

## DEFENDANT REED K. AKEN SR.'S SENTENCING STATEMENT

The Defendant, REED K. AKEN, SR. (hereinafter "Aken"), files the following objections to the draft Presentence Report (PSR) of U.S. Probation Officer Anne M. Shimokawa dated February 14, 2006.

Introduction:

This case is about how a former Maui Police Department (MPD) Officer that faithfully served his community with dedication, honor and integrity for about 5 years on Maui, receiving several commendations along the way, would eventually resign from his high-stress job as a MPD Officer

following several attempts upon his life and then only to find himself homeless, destitute, with a broken marriage and divorce behind him and addicted to ice while bouncing in between menial jobs.

In this condition, Aken would find himself being used by his former wife as well as by notorious Maui drug dealer, Nathaniel "Bobo" Russell ("Russell"), (both of whom took advantage of the fact that Aken was broke) to be a courier of methamphetamine from Las Vegas to Hawaii.

On Aken's first and only trip as a courier for Russell and the only on a promise for a parsley sum of money that Russell agreed to pay Aken upon his return, Aken gets arrested on his way back to Hawaii in Los Angeles with two pounds of ice.

Aken never did get paid by Russell.

When this Honorable Court compares Aken's role as courier with the enormous amounts of drugs and money Russell and other members of his ring dealt and made, respectively, Aken is, at best a minor role, minimal role, peripherally involved, defendant.

Although this story is not yet complete, along the way, we find a story of the power of hope, faith, recovery and redemption where it was Aken who was the first one to accept responsibility and cooperate.

This cooperation by Aken would prove crucial and pivotal in assisting the United States Government to putting an end to this large drug distribution ring on the island of Maui and prosecuting all of its major players.

Again, it would be Aken that that stepped up to the plate and pleaded guilty first. This, as this Honorable Court will find, led, in turn, to every single one of the other major defendants, from Las Vegas drug dealer, Leandro

"Leo" Gomez, III, and his underling, Timothy Sullivan, all the way to Maui drug dealer Russell and his underlings, Pamela Newton, John Corniel, Jr., Cyrinah Aken, Charles Farren and Roger Manu Bates---all of them pleaded guilty because of Aken's pivotal cooperation and entering a guilty plea at the outset of this case.

In this Maui drug-ring, in which Aken was acted as a courier on his very first and only trip, it would turn out that Aken was the only person who actually got to meet, in person, with the large-scale, Las Vegas drug dealer and major supplier, Leandro "Leo" Gomez, III.  This fact would again prove crucial in assisting the United States in making their case against the main drug supplier, Leandro "Leo" Gomez, III.

As of this writing, only one defendant remains, Gilbert Gomez, (brother of Leandro Gomez,) that has not pleaded guilty.

By Aken's efforts, he has saved the United States Government hundreds of thousands of dollars of expense and an enormous amount of time and resources it would take to prepare for and try and convict all but one of the above defendants.

As will be illustrated below, Aken has seized this tragic chapter in his life and turned it into an opportunity to improve his own lot in life by keeping it simple and staying clean, one day at a time, and returning to church.  Aken was lost.  However, Aken has returned with a renewed and restored faith in God and stands ready to face the consequences in this matter.

It is in this light that Aken respectfully submits the following objections to the draft PSR:

First Objection:

Aken objects to the PSR, page 12, paragraph #27, and page 19, paragraph #58.

Aken lied to the LA PD because Aken was fearful of Russell, Russell's cohorts, as well as their friends and acquaintances that hung around Russell that Aken knew to be dangerous people dealing and using methamphetamine.

It is a well known fact that drug dealers carry weapons to protect their illegal operations and, on a regular basis, use threats and project threats in order to continue to carry out their drug dealing and collect their drug proceeds.

Aken lied to protect his family *from* Russell, not to protect Russell as the PSR erroneously reflects.

This Honorable Court should consider that Aken just lost two (2) pounds of Russell's ice in the arrest at LAX airport and that Aken was afraid of what Russell would do to Aken's family when Russell found out.

Second Objection:

Aken objects to the draft PSR, page 18, paragraph #55. It is factually incorrect.

Aken was homeless at the time of his arrest and told arresting MPD Officer Dean Ricard and the two unknown FBI agents that accompanied Ricard at the time of Aken's arrest. Also, when cooperating with law enforcement investigation, Aken also told MPD undercover Officer Wade Maeda that Aken was homeless at the time of his arrest.

Aken never resided at any time at 1110 Puana Street, Makawao. At the time of his arrest, Aken was arrested at

4

work: Kiwi Pacific Construction in Lahaina. Aken slept in his car: an old, 88' Oldsmobile.

Third Objection:

Aken objects to the draft PSR, page 19, paragraph #57.
Aken did not smoke ice with Leandro "Leo" Gomez, III. Aken only smoked with Gilbert "Glen" Gomez, Leandro "Leo" Gomez's brother, but it was at Leandro "Leo" Gomez, III's house.

Fourth Objection:

Aken objects to the draft PSR being devoid of any mention of Aken being a minor role participant in this conspiracy.

While Maui drug dealer Russell was out threatening major drug dealer and supplier, Leandro "Leo" Gomez, III, in Las Vegas, and Russell thereafter was obtaining vast quantities of methamphetamine and Russell's underlings Pamela Newton, John Corniel, Jr., Cyrinah Aken, Charles Farren and Roger Manu Bates were wheeling and dealing methamphetamine, all the while all of them living the high life with all their ill-gotten monies, etc., Aken did not even have enough money to rent a room in an apartment, and was living out of the trunk of his old, 1988 Oldsmobile, using the back seat for his place to sleep, while parking overnight at various parks.

When this Honorable Court considers Russell and the rest doing what they did and compares that to Aken being sent to Las Vegas to bring back two pounds, Aken respectfully submits that his role was very minor when

compared to Gomez, Russell, Newton, Corniel, Cyrinah Aken, Farren and Bates.

Aken's position is that he was a minor role participant and requests this Honorable Court to exercise its broad discretion at sentencing to consider this factor prior to sentencing.

In this regard, the downward adjustment for Aken as reflected in the PSR is inadequate to show Aken's peripheral involvement.

Although the PSR accurately reflects that Leandro "Leo" Gomez, III, and Nathaniel "Bobo" Russell and the rest of their big time dealing in large quantities of ice, the PSR does not accurately show Aken's peripheral involvement in the over-arching scheme orchestrated by Leandro "Leo" Gomez and Nathaniel "Bobo" Russell.

Therefore, Aken humbly requests that this Honorable Court provide for a peripheral involvement basis to depart downward.

Fifth Objection:

Aken objects on the ground that the draft PSR is devoid of any mention that Aken played a minimal role in the offense. As stated in U.S. v. Webster, 966 F.2d 209 (9th Cir. 1993), Defendant's role in the offense makes couriers eligible for mitigating role adjustments. In this case, Aken was a courier and could hardly be described as a major drug dealer in receiving drugs from Leandro "Leo" Gomez, III, and attempting to deliver such drugs to drug dealer Russell and his underlings.

Therefore, a mitigating role adjustment may be appropriate and Aken urges this Honorable Court to make such a mitigating role adjustment.

Sixth Objection:

Aken is a simple drug addict, not a big time drug dealer. Aken is in recovery from his addiction to ice. On March 3, 2006, Aken will make eight (8) months clean. Aken fully understands that based upon all evidence and information about ice and its powerful addiction, Aken will have to fight this drug addiction and all other drug addictions for the rest of his life.

However, the fact remains that Aken is a drug addict. In this regard, Aken agreed to be a courier to make some badly needed money and to support his own drug habit in order to try and bring back two (2) pounds of ice to Hawaii for Russell. Therefore, Aken respectfully requests this Honorable Court exercise its broad discretion to provide Aken with an additional basis to depart downward.

Seventh Objection:

Aken admits to having a drug problem and, as this Honorable Court is fully aware, his ex-wife, Cyrinah Solomon Aken ("Cyrinah"), introduced Aken to Maui drug dealer, Nathaniel "Bobo" Russell, because 1) Cyrinah knew that Aken was broke and homeless and needed money; 2) Cyrinah knew that Aken had now become addicted to ice; 3) Cyrinah knew that Aken was bouncing between menial jobs and living hand to mouth and out of the trunk of his old Oldsmobile, and; 4) Cyrinah thought she could get in tight

7

with Pamela Newton ("Newton"), Nathaniel "Bobo" Russell's wife, in order for Cyrinah to get occasional free drugs and/or better deals and/or favorable treatment from both Newton and Russell when obtaining ice from the both of them.

However, Aken knows he has a drug problem. Aken has tried drug treatment and has succeeded with the Hina Mauka Outpatient program and graduated from same.

After Aken serves his time, Aken knows he has to stay clean and understands that sometimes the pressure of life itself could bring on a relapse and, in this regard, Aken desires to arm himself with additional tools that will keep him clean throughout the rest of his life and therefore, respectfully requests that this Honorable direct in its Sentencing Order that Aken receives the benefit of the intensive substance abuse treatment program operated at the Federal Bureau of Prison to treat Aken's addiction to methamphetamine and/or to any other drugs.

This Honorable Court has the authority to recommend that Aken enter the drug abuse program pursuant to B.O.P. PS 5330.0, as well as the destination pursuant to B.O.P. PS 5100.07. Aken respectfully requests participation in a drug treatment program at a Facility that offers such program(s).

Eighth Objection:

Aken objects to the draft PSR being devoid of any mention of any basis that the amount of drugs over stated Aken's culpability.

The second time Aken met Russell was at a chicken fighting derby held at the old Maui High School. At this

particular meeting, Russell approached Aken with the offer that if Aken "did a job" for Russell, Russell would pay Aken $2,000.00.

Russell further described the offer that if Aken traveled to Las Vegas, Russell would pay Aken $2,000.00, upon Aken's return. Aken agreed and said, "I'll take the job."

Aken understood that to mean that Aken would be traveling to pick up drugs and thought it would be ice because Aken knew that Russell was dealing ice.

Russell did tell Aken that Aken would be taking "some cash" to Las Vegas, but, and this is very important for this Honorable Court to consider, Russell never told Aken how much money Aken would be taking to Las Vegas at this particular meeting.

In fact, approximately two days later, as Aken was preparing to leave and catch his ride to the airport to make the flight, only then was Aken given a bag by co-defendant, John Corniel, Jr. ("Corniel") (that Aken believes was packed with the assistance of his ex-wife, Cyrinah, with clothes that fit him and money).

Only when Corniel gave the pre-packed bag to Aken, right before Aken left to the airport, only then did Corniel tell Aken that there was $66,000.00, in the bag.

Corniel and Cyrinah both told Aken to "bring back two pounds."

At no time did any person, neither Russell, Corniel, Cyrinah nor anybody else ever tell Aken that the $66,000.00 was payment for a total of seven (7) pounds and that, although Aken was supposed to return with two (2) pounds, five (5) pounds were going to be shipped to Maui by other means.

Aken thought that Russell owed the money to the Las Vegas dealer that Aken only knew at that time as "Leo."

Aken never questioned Russell, Corniel or Cyrinah.

Although Aken fully accepts his role as courier and apparent instrument in facilitating a deal that would eventual amount to seven pounds of methamphetamine, Aken respectfully points out that he returned to Hawaii with only two (2) pounds.

Further, Aken had no knowledge of, nor control over, the amount or purity of drugs he received and then attempted to deliver to Russell and his underlings.

Under these facts, according U.S. v. Mendoza, 121 F.3d 510 (9th Cir. 1997), the District Court here has the discretion to depart on the ground that the defendant had no knowledge of or control over the amount or purity of the drugs.  This is also the case for Aken.

Aken simply received the two (2) pounds of the drugs from Gilbert Gomez at the direction of Leandro "Leo" Gomez, III, who told his brother to show Aken "the goods."

Aken fully understands that gravity of his conduct and knows he has to pay the price, however, this Honorable Court should show mercy because, after all, Aken is a victim of these drug dealers' scheme.

Aken did not have any negotiating power to limit the amount of drugs he received and then attempted to deliver to Russell.

In this regard, Aken respectfully requests this Honorable Court provide and additional basis to depart downward on the basis that the amount of drugs attributed to Aken overstates Aken's criminal culpability in this conspiracy.

Ninth Objection:

Aken objects because the PSR only briefly mentions on Page 25, paragraph #92, regarding Aken's Mental and Emotional Health, that Aken suffers from PTSD.

As mentioned in the above introduction of this sentencing statement of Aken, this case is about a very tragic chapter in Aken's life.

As a continuation of the introduction it is pointed out here that while Aken was still an MPD officer seeking psychological treatment for PTSD, his medical insurance was cut-off by MPD and he was subsequently abandoned by MPD with regards to the needed medical attention.

Perhaps a brief summary of Aken's emotional scars left by his five (5) years of service with MPD would assist this Honorable Court.

Aken started MPD recruitment class around September of 1998, and shortly thereafter, his daughter Alisia was born on October 5, 1998, the third child with his union with his former wife and now co-defendant, Cyrinah.

Aken completed the rigorous MPD recruitment course without incident, graduated and was subsequently sworn in on April 16, 1999.

Aken was assigned to the MPD ride along for three (3) months. On his very first assignment in the ride along program, Aken responded to a motor vehicle accident where a four year old child's head was crushed by van. Aken drank a case a beer that night. Aken was shocked, to say the least, as probably anybody else would that saw that kind of traumatizing accident scene. Otherwise, Aken successfully completed the three (3) month program and then was assigned to go solo in a MPD issued vehicle.

Two weeks into the job riding solo, Aken, by himself, caught up with his first murderer, Mr. Dennis Love, whom, Aken was notified via radio report that Mr. Love had just brutally strangled another homeless woman in front of several witnesses and had fled the scene and was reported heading toward a golf-course.

Aken caught up with Mr. Love, cornered Mr. Love and, during the course of making the arrest, Aken was attacked with a metal pipe with a sharp end. Mr. Love fought off Aken and in the course of the resistance also caused severe criminal property damage to Aken's MPD issued vehicle and everything that comes with that kind of scene.

Nevertheless, Aken was able to tackle Mr. Love until help arrived and not until Mr. Love had proceeded to resist and struggle with Aken on the ground.

Mr. Love had just killed someone and Aken thought if Mr. Love got a hold of Aken's MPD issued firearm, Mr. Love would have killed Aken too.

It was a struggle for Aken's life. This murderer, having taken multiple swings at Aken, could have ended Aken's life as well. In other words, Mr. Love did not want to be taken in.

Aken would then be assigned to the economically depressed and crime-ridden island of Molokai, mostly apprehending people breaking into tourist cars. Aken, in shape, was very good at this chasing (on foot most of the time) successfully apprehending these folks hurting our tourist industry.

On Molokai, Aken recovered a total of six (6) suicide bodies as well as was involved in the investigations of each. Two (2) Filipinos and four (4) Hawaiians.

Aken also responded to two (2) riots, one in Molokai Ranch, Hoolehua and one in the east end, Onolii. These were full on fist fights, complete with trouble makers throwing beer bottles, yelling threats, at the cops and damaging their vehicles. Outnumbered, Aken used his wits to wait until each incident subsided before collecting names.

Aken's Molokai assignment was supposed to be for a year, but Aken only served on Molokai for 11 months and then returned to Maui. Aken returned back to Maui around November of 2001, where Aken was put into a situation where there was yet another attempt made upon Aken's life.

Aken first went to his supervisors for help. Then Aken went to go see a psychologist, Dr. David Whitingburg, Ph.D., because of the job stress and mounting marital problems exacerbated by the marital separation brought on by his assignment to Molokai.

Not getting anywhere, growing marital problems, increasing frequency of arguments and fights with his then wife, Cyrinnah, who was complaining about Aken always being at work, resulted in Aken going through a divorce in late 2003 and early 2004. This, coupled with the fact that MPD stopped paying Aken's medical coverage, and therefore Aken could no longer afford to seek help from Dr. Whitingburg, brought Aken to a breaking point and crisis.

Stress, depression, not getting anymore counseling, and going through a divorce---things looked pretty bleak for Aken. Then, two to three days after Aken's 35th birthday, Aken tried to put an end to it all but fortunately, his service revolver misfired.

Aken then took stress leave from MPD around November 2003. At the same time, MPD took away Aken's service revolver. This was the right move by MPD.

Aken subsequently resigned from MPD.

Aken thereafter was kicked out of the house by Cyrinah and became homeless. After Aken left, he was subsequently evicted from three other places as well.

Aken started living out of his car in the month of December 2004 and remembers well that Christmas day. Homeless, destitute, addicted to ice, his ex-wife, Cyrinah, approached Aken in March and April with the idea of Aken making money, because Cyrinah knew Russell needed (a) courier(s) and that Aken had now become addicted to ice.

In this regard, Aken respectfully requests this Honorable Court consider this above objection and all factual statements made within this objection when considering this or any other basis that warrants this Honorable Court's attention and focus to provide Aken with this or any other basis to depart downward prior to imposition of sentence in this matter.

Tenth Objection:

Aken objects because the draft PSR does not adequately reflect the extreme hardship that will be imposed upon Aken's family by any extended term of incarceration.

Aken has three (3) children from his ex-wife Cyrinah, and two (2) more children with his fiancé, Cindy Luuloa. On top of that, fiancé Cindy Luuloa has four (4) children of her own from a previous marriage. In other words, Aken has an obligation towards a total of nine children, plus his fiancé and himself, for a total of 11 people.

Aken is now working as a construction laborer in providing for his family members. Aken has visitation with his three (3) children from Cyrinah on the weekends and provides for their needs as best he can. Aken lives with his fiancé Cindy Luuloa and provides for her four (4) children from her previous marriage, as well as is providing for his two (2) children from his relationship with Cindy Luuloa. Plus, Aken also provides for Cindy Luuloa and himself as well.

Aken is an able-bodied working man, paying his bills. Bills that are not going to be paid as long as Aken is incarcerated.

Aken respectfully requests this Honorable Court consider the extreme financial hardship that will be imposed upon Aken's family by any extended term of incarceration as a basis to depart downward prior to imposing sentence in this matter.

Eleventh Objection:

Aken objects to the draft PSR because it does not adequately reflect the special circumstance, characteristic and attributes associated with sending this former police officer to federal prison.

If and when Aken begins serving his time, this Honorable Court should consider that wherever Aken serves his time, word will spread quickly that Aken is a former police officer.

The Honolulu Advertiser and Star-Bulletin as well as the Maui News, newspapers have already printed and published Aken's name and otherwise told the general public that Aken is a former Maui Police Officer.

Putting aside for the moment, the shame, ridicule, name-calling, talk behind his back, talking under their breath, gossip, finger-pointing, whispers, etc., etc., when Aken gets to Federal prison, things are going to be real tough for Aken and his life may well be, if not already is, in danger.

On top of that, Aken was the one that brought the roof down on Leandro "Leo" Gomez, III, and his underling, Timothy Sullivan, Maui drug dealer Russell and his underlings, Pamela Newton, John Corniel, Jr., Cyrinah Aken, Charles Farren and Roger Manu Bates.

First, Aken gets arrested and then in come the rest of these defendants: of course they are going to blame Aken.

There is a very real threat that these people and/or their connections are going to retaliate and try to hurt Aken for being the first one to cooperate and bring these people in. On top of that, Aken is a former police officer and it is common knowledge that most criminals, especially those serving time, do not care for police officers.

Aken knows he has to face the music and pay society and do his time.

However, the longer Aken is incarcerated, the greater the chance that he will suffer from possibly life-threatening harm, injury and/or death.

All Aken asks is that this Honorable Court consider this special circumstance, character, condition and attribute associated with Aken being a former law-enforcement officer subject to retaliation while serving his time as an additional basis for this Honorable Court to depart downward or otherwise not impose an extended term prior to imposing sentence in the matter.

Conclusion:

Based on the above objections and any other basis this Honorable Court finds warranting any additional basis to depart downward, Mr. Reed K. Aken, Sr., humbly and respectfully requests this Honorable Court exercise its broad discretion at sentencing in this matter.

DATED: February 27, 2006, at Honolulu, Hawaii.

Respectfully submitted,

EMMETT E. LEE LOY
Attorney for Defendant
REED K. AKEN, SR.

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document, REED K. AKEN SR.'S SENTENCING STATEMENT, and this Certificate of Service, were duly served upon the following persons:

> MICHAEL K. KAWAHARA (HAND-DELIVERED)
> Assistant United States Attorney
> PJKK Federal Building
> 300 Ala Moana Boulevard, Room 6-100
> Honolulu, Hawaii, 96850
>
> -and-
>
> ANNE M. SHIMOKAWA (HAND-DELIVERED)
> U.S. Probation Officer
> PJJK Federal Building
> 300 Ala Moana Boulevard
> Honolulu, Hawaii 96850

DATED: February 27, 2006 at Honolulu, Hawaii.

> EMMETT E. LEE LOY
> Attorney for Defendant
> REED K. AKEN, SR.